UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA

LUTHER GRAY,                        )
                                    )
            Plaintiff,              )
                                    )
v.                                  )     No. 1:08-cv-263-DFH-TAB
                                    )
DR. PAUL A. TALBOT, et al.,         )
                                    )
            Defendants.             )

**Entry Discussing Cross-Motions for Summary Judgment**

For the reasons explained in this Entry, the defendants' motion for summary judgment must be granted, while that of the plaintiff must be denied, and judgment shall be entered accordingly.

**I. Background**

Luther Gray ("Gray") was previously incarcerated at the Marion County Jail ("Jail") and at the Correctional Industrial Facility ("CIF"). Gray alleges that while he was in these institutions, the defendant physicians and their employer, Correctional Medical Services ("CMS"), violated his right to constitutionally adequate medical care. He sues these physicians, Dr. Talbot and Dr. Elrod, and CMS pursuant to 42 U.S.C. § 1983. Specifically, Gray alleges that Dr. Talbot was "deliberately indifferent to plaintiff's serious medical needs of prostate cancer, Hepatitis C and constructive sleep apnea, beginning March 6, 2007 until June 11, 2007," and that Dr. Elrod was "deliberately indifferent to plaintiff's serious medical needs of cancer, hepatitis C, and sleep apnea from July 11, 2007 until the filing of this complaint." Dr. Talbot was responsible for Gray's medical care while he was at the Jail, while Dr. Elrod was responsible for Gray's medical care while he was at the CIF.

Gray seeks resolution of his claims through the entry of summary judgment, as do the defendants. Any such motion must be granted if "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Scott v. Edinburg,* 346 F.3d 752, 755 (7th Cir. 2003) (quoting **FED.R.CIV.P.** 56(c) and citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986)). The role of Rule 56 is to "enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues." *Lujan v. National Wildlife Federation,* 497 U.S. 871, 888 (1990). "The applicable substantive law will dictate which facts are material." *National Soffit & Escutcheons, Inc.,*

*v. Superior Systems, Inc.,* 98 F.3d 262, 265 (7th Cir. 1996) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). "Factual disputes are 'genuine' only 'if the evidence is such that a reasonable jury could return a verdict for the [non-movant].'" *Oest v. Illinois Dep't of Corrections,* 240 F.3d 605, 610 (7th Cir. 2001) (quoting *Anderson,* 477 U.S. at 247). A "material fact" is one that "might affect the outcome of the suit." *Anderson,* 477 U.S. at 248. A dispute is genuine only if a reasonable jury could find for the non-moving party. *Id.*

## II. Discussion

The claims in this action are brought pursuant to 42 U.S.C. § 1983. "Section 1983 is not itself a source of substantive rights; instead it is a means for vindicating federal rights elsewhere conferred." *Ledford v. Sullivan,* 105 F.3d 354, 356 (7th Cir. 1997) (citing *Baker v. McCollan*, 443 U.S. 137, 144, n.3 (1979)). Accordingly, "the first step in any [§ 1983] claim is to identify the specific constitutional right infringed." *Albright v. Oliver,* 510 U.S. 266, 271 (1994). The constitutional provision pertinent to the claims here is the Eighth Amendment's proscription against the imposition of cruel and unusual punishment. *Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."). The Eighth Amendment provides the proper substantive standard even if Gray was a pretrial detainee for a period of time while at the Jail. *Board v. Farnham,* 394 F.3d 469, 477-78 (7th Cir. 2005); *Cavalieri v. Shepard,* 321 F.3d 616, 620 (7th Cir. 2003).

Pursuant to the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement by ensuring that inmates receive adequate food, clothing, shelter, and medical care, and by taking reasonable measures to guarantee the safety of the inmates. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994); *Vance v. Peters,* 97 F.3d 987, 991 (7th Cir. 1996), *cert. denied,* 520 U.S. 1230 (1997). "Prison officials violate the Constitution if they are deliberately indifferent to prisoners' serious medical needs. A claim based on deficient medical care must demonstrate two elements: 1) an objectively serious medical condition, and 2) an official's deliberate indifference to that condition." *Williams v. Liefer,* 491 F.3d 710, 714 (7th Cir. 2007)(some internal citations omitted). A serious medical need is one that has been diagnosed by a physician as needing treatment or one for which even a layperson would recognize the need for a doctor's care. *Henderson v. Sheahan,* 196 F.3d 839, 846 (7th Cir. 1999). As to the second element, deliberate indifference requires a showing that the official was actually aware of a serious risk yet failed to take appropriate action. See *Whiting v. Marathon County Sheriff's Dep't,* 382 F.3d 700, 703 (7th Cir. 2004); *Jackson v. Ill. Medi-Car, Inc.,* 300 F.3d 760, 765 (7th Cir. 2002). For a medical professional to be liable for deliberate indifference to an inmate's medical needs, he must make a decision that represents "'such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment.'" *Sain v. Wood,* 512 F.3d 886, 895 (7th Cir. 2008) (quoting *Collignon v. Milwaukee County,* 163 F.3d 982, 988 (7th Cir. 1998)); see also *Johnson v. Doughty,* 433 F.3d 1001, 1013 (7th Cir. 2006).

A court examines the totality of an inmate's medical care when determining whether prison officials have been deliberately indifferent to an inmate's serious medical needs. *Reed v. McBride,* 178 F.3d 849, 855 (7th Cir. 1999). The evidence relative to Gray's medical care at the Jail and at the CIF shows the following:

Gray arrived at the Marion County Jail on March 6, 2007. Upon intake, Gray indicated he was negative for Hepatitis, positive for hypertension, and had a history of prostate cancer but was on no medications. Gray also indicated he used a C-pap machine for sleep apnea.[1]

On March 8, 2007, Gray was prescribed Felodipine and Hydrochlorothiazide for his hypertension.[2] Gray was also informed that he would be allowed to use his C-pap machine for his complaints of sleep apnea when it was brought to the Jail by a friend or family member.

On April 11 or 19, 2007, labs were obtained to determine Gray's prostate function (PSA level) and Hepatitis status.

On April 21, 2007, lab results were positive for Hepatitis C. Dr. Talbot testified that his plan was to monitor Gray's liver transaminase enzymes every three to six months and his PSA serum levels every six months. Due to Gray's PSA level and the fact that he did not have a weak urinary stream, no medications were necessary and no further treatment was warranted.[3]

On May 7, 2007, Gray's Hydrochlorothiazide was increased in an effort to control his hypertension.[4]

On June 6, 2007, during a chronic care visit for his hypertension, Gray's blood pressure was not controlled despite an increase in his medications. Noncompliance of his medications was suspected. Gray was admitted to the infirmary for blood pressure evaluation under closely monitored conditions. Gray would also be monitored for his alleged sleep apnea issues.

---

[1] Gray states in his affidavit that on March 6, 2007, his blood pressure registered as 150/92 and he was not given medication to lower it nor provided a C-pap machine for his sleep apnea.

[2] Gray states that his blood pressure registered as 180/98 and that he was prescribed an inadequate amount of Felodipine 5 mg to control his blood pressure.

[3] Gray disapproved of Dr. Talbot's treatment plan. Gray testified that he requested but did not receive treatment for Hepatitis. Gray states that Dr. Talbot told him that Hepatitis C was too expensive to treat. Gray asserts that his PSA test results were abnormally high and that Dr. Talbot should have ordered additional tests or referred him to a specialist.

[4] Gray asserts that even though his Hydrochlorothiazide was increased, his Felodipine prescription remained at an inadequate dosage of 5 mg per day.

During Gray's time in the infirmary, his blood pressure showed improvement without adjusting his medications.[5] This further confirmed Dr. Talbot's suspicion of noncompliance. Additionally, Gray displayed no evidence of airway obstruction or other sleep apnea related issues.[6]

Gray was transferred out of the Jail on or about June 11, 2007, and relocated to the Regional Diagnostic Center ("RDC"). Gray states that on June 12, 2007, during intake at the RDC, Nurse Practitioner Richard Willard wrote in Gray's medical records that he had a risk factor of sleep apnea and that this document was in Gray's file when he arrived at the CIF.

Gray arrived at the CIF on or about July 9, 2007.

Gray testified that on July 17, 2007, he sent a "request for health care" to the health care administrator seeking care for cancer, "HCV," sleep apnea and hypertension. He was seen days later by Dr. Elrod, who Gray claims did not complete a physical examination.

On July 23, 2007, Gray was seen by employees of the medical department for hypertension and prostate issues. Gray's June 2007 PSA lab results were within normal limits. Gray was started on Cardura for his prostate and placed on chronic care status and continued on Plendil for his hypertension. Gray did not complain of sleep apnea or other related sleep issues at that time.

Gray testified that on July 25, 2007, he complained that his serious health issues of sleep apnea and hepatitis C were not adequately addressed by Dr. Elrod. Gray contends that his medical test records show his alpha-fetoproten level being out of range, however, Dr. Elrod's affidavit states that Gray's PSA was within normal limits and his liver enzymes were within normal limits.

On September 5, 2007, Gray was seen at a chronic care visit. Because his blood pressure was still high, Gray's Plendil was discontinued and he was prescribed Norvasc. Gray's Cardura was also increased due to his complaints of frequent urination. Labs were ordered to check Gray's PSA levels. On September 18, 2007, the results of Gray's labs revealed his PSA levels were still within normal limits.

Gray was seen again on September 24, 2007, for his blood pressure. His pressure was stable and he was continued on his current medications. Again, no mention of sleep issues was made.

---

[5] Gray asserts in his affidavit that from June 6, through June 11, 2007, his blood pressure was inconsistent.

[6] Gray argues that the jail infirmary was not equipped to conduct a sleep study to diagnose his sleep apnea.

Laboratory tests were ordered again on November 16, 2007. The results revealed that Gray's PSA levels and liver enzymes were within normal limits.

Gray was seen again for his blood pressure on December 18, 2007. Dr. Elrod testified that Gray voiced no concerns and his blood pressure was stable.[7]

On February 29, 2008, Gray's Norvasc was increased to control his blood pressure. Also, due to Gray's continued concerns regarding his prostate and despite his normal PSA lab results, Dr. Elrod requested a urology consultation. On March 13, 2008, lab results again revealed PSA levels and liver enzymes within normal limits.[8]

On April 11, 2008, Gray underwent a prostate biopsy at Wishard Hospital. The results revealed benign tissue and no cancer was detected. Gray was transferred to the Pendleton Correctional Facility in April of 2008.

Dr. Elrod testified that due to Gray's consistent liver enzyme lab results, no treatment was necessary for his Hepatitis C.

These undisputed facts show that defendants took consistent and substantial steps to diagnose and treat Gray's conditions. For example, Dr. Talbot ordered labs to monitor Gray's prostate and liver functions. Due to the results, additional treatment was not warranted for either condition. Dr. Talbot also found no evidence of sleep apnea when Gray was housed in the infirmary at the Jail. Dr. Elrod also ordered labs and regularly monitored Gray's PSA levels and liver enzymes. Again, due to the results of these labs, additional treatment was not indicated. Dr. Elrod even ordered a urology consultation and biopsy to further evaluate Gray's fears of prostate cancer. Again, the biopsy results were negative.

Assuming that Gray's conditions are "serious medical needs," there is no evidence to support an inference that either Dr. Talbot or Dr. Elrod acted with a sufficiently culpable state of mind and deliberately ignored Gray's medical conditions. The fact that Gray was displeased with the type of treatment and monitoring he was receiving for his conditions does not establish deliberate indifference on the part of Dr. Talbot or Dr. Elrod. On the contrary, "[a] difference of opinion as to how a condition should be treated does not give rise to a constitutional violation." *Garvin v. Armstrong,* 236 F.3d 896, 898 (7th Cir. 2001).

The evidentiary record in this case negates the presence of the subjective state of

---

[7] Gray disputes Dr. Elrod's testimony that on December 18, 2007, Gray voiced no concerns. Gray explains that on December 6, 2007, he sent a return receipt certified letter to the President and CEO of defendant CMS stating that Dr. Elrod and others were deliberately indifferent to his serious medical needs and that suit would be filed within seven days if he was not provided with adequate medical care. Gray's letter to CMS does not conflict with Dr. Elrod's testimony that Gray did not voice his concerns to Dr. Elrod on December 18, 2007.

[8] Gray points out that although his March 13, 2008, lab results revealed PSA levels and liver enzymes were within normal limits, his CFR and MPV were high. Gray does not provide any evidence regarding the medical significance of these results.

5

mind required to show deliberate indifference, *i.e.*, that a defendant was "subjectively aware of [Gray's] serious medical needs and disregarded an excessive risk that a lack of treatment posed to his health or safety." *Wynn v. Southward,* 251 F.3d 588, 593 (7th Cir. 2001). Similarly, Gerald offers no evidentiary basis to support a finding that the defendant physicians were not exercising reasonable professional judgment when assessing and treating his medical condition and needs. Dr. Talbot and Dr. Elrod are therefore entitled to judgment as a matter of law. As to the third defendant,

> CMS is also a defendant in the case, and plaintiff seeks to hold it liable for the actions of its employees. *Monell v. Department of Social Services,* 436 U.S. 658, 690-91, 98 S. Ct. 2018, 56 L.Ed.2d 611 (1978), requires a plaintiff seeking to hold a municipal government liable for a constitutional violation to show that the violation was caused by a municipal policy, law, or custom. In other words, the tort doctrine of respondeat superior, holding employers vicariously liable for torts of their employees within the scope of their employment, does not apply to municipal governments. The Seventh Circuit has applied this doctrine to private corporations sued under § 1983.
> 
> In *City of Los Angeles v. Heller,* 475 U.S. 796, 106 S. Ct. 1571, 89 L.Ed.2d 806 (1986), the Supreme Court held that a local government cannot be held liable for a constitutional deprivation allegedly brought about through an official policy or custom if a determination has been made that there was no constitutional violation committed by anyone in the first place. The undisputed facts here show that no individual defendant violated Gerald's Eighth Amendment rights in providing his medical care at New Castle. Under the reasoning of *Heller,* there is no viable § 1983 claim against CMS, regardless of the issue of vicarious liability.

*Gerald v. Indiana Dept. of Correction,* 2009 WL 1795178, \*\*3-4 (S.D.Ind. 2009)(some citations and footnote omitted). The same conclusions, for the same reasons, are compelled here as to Gray's claim against CMS.

### III. Conclusion

Although "'federal courts must take cognizance of the valid constitutional claims of prison inmates,'" *Babcock v. White,* 102 F.3d 267, 275 (7th Cir. 1996) (quoting *Turner v. Safley,* 482 U.S. 78, 84 (1987)), no viable claim of that nature has been presented by Gray in this case. It has been explained that "summary judgment serves as the ultimate screen to weed out truly insubstantial lawsuits prior to trial." *Crawford-El v. Britton,* 118 S. Ct. 1584, 1598 (1998). This is a vital role in the management of court dockets, in the delivery of justice to individual litigants, and in meeting society's expectations that a system of justice operate efficiently. For the reasons explained in this Entry, therefore, the defendants' motion for summary judgment (dkt 34) is **granted** and Gray's motion for summary judgment is **denied.**

Judgment consistent with this Entry shall now issue.

So ordered.

Date: August 12, 2009

*David F. Hamilton*

DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana